IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>        Plaintiff,<br><br>   v.<br><br>ELIJAH COOPER,<br><br>        Defendant.<br>                                           / | No. C 09-00156 SI<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT** |

On July 28, 2009, the Court heard oral argument on defendant's motion to dismiss the indictment. After the hearing, the Court determined that an evidentiary hearing was necessary to resolve the issue of whether the San Francisco Police Department destroyed potentially exculpatory evidence in bad faith. On September 24, 2009, the Court conducted an evidentiary hearing and heard testimony from Officer Ajay Singh, one of the officers involved in the handling of the evidence at issue. Having considered Officer Singh's testimony as well as the arguments of the parties and the papers submitted, the Court DENIES defendant's motion to dismiss the indictment.

**BACKGROUND**

**1.    Defendant's Arrest**

On January 15, 2009 at approximately 11:30 p.m., San Francisco police officers Ajay Singh and Brandon McKelley observed a car that they claim had only one working headlight. *See* Decl. of Ronald Tyler in Supp. of Mot. to Dismiss ("Tyler Decl."), ex. H (San Francisco Police Dep't Incident Report). The officers effectuated a traffic stop for driving without working lighting equipment, in violation of section 24252(a) of the California Vehicle Code. A computer check on the car revealed that it was

registered to defendant. Officer Singh knew from prior contact with defendant that he was on probation for narcotics violations. As Officer McKelley approached the car, he could smell marijuana emanating from inside the vehicle. The officers searched defendant's person and seized a plastic bag containing substances that later tested positive for base rock cocaine and cocaine powder. *Id.* Defendant claimed that if the Court were to conduct a hearing to evaluate the lawfulness of his arrest, he would argue that both headlights on his car were working when the police officers stopped him. Def. Mot. at 15.

**2.    Defendant's Prosecution**

Although he was originally charged with violations of state law, defendant's case was transferred to federal court on charges of possession of a controlled substance with intent to distribute. On February 27, 2009, San Francisco Superior Court held a hearing to dismiss the state charges against defendant before his transfer to federal court. At that proceeding, the following exchange took place:

> Defense:        I've had some experience in cases that transfer from one prosecuting jurisdiction to another. I'd ask the Court to enter an order for the People to preserve and not destroy any evidence that may be in the case in that – with the potential that there may be some exculpatory evidence. I want to make sure that, with the transfer of jurisdictions, that the evidence be preserved that was being held by the State in the State case.
>
> Court:          Counsel.
>
> Prosecution:    I don't know of any plan to destroy it. I'll look into it. I don't foresee them destroying evidence.
>
> Defense:        That's fine.
>
> Court:          All right. Then hearing no opposition to the People's motion, this matter will be dismissed pursuant to 1385 of the Penal Code.

Tyler Decl., ex. A (Superior Court transcript). The minutes of the February 27 proceeding include the following notation: "THE COURT ORDERS: EVIDENCE NOT TO BE DESTROYED." *Id.*, ex. B (Superior Court Minutes).

Defendant was arraigned in federal court on March 3, 2009. At the arraignment before Magistrate Judge Edward Chen, defense counsel advised the Court that the car defendant was driving at the time of his arrest was about to be sold. *Id.*, ex. C (declaration describing transcript of federal proceeding). AUSA Matthew McCarthy responded that he was aware the car was impounded, but had

1 not known it was for sale. *Id.* He advised the Court that he would look into the matter. *Id.*

**3.     The Car**

After defendant's arrest, a police officer drove defendant's car to the Bayview police station. Decl. of Ajay Singh in Opp. to Def. Mot. ("Singh Decl.") ¶ 5. At the police station, Officer Singh conducted a search of defendant's car and did not find any contraband. *Id.* ¶¶ 6-7. He then filled out a tow slip, dated January 16, 2009, indicating that the car was not subject to any holds and should be towed to AutoReturn. *Id.*; *see also id.*, ex. B (tow slip). AutoReturn is a towing company under contract with the City of San Francisco to transport, store, and return vehicles that City agencies order towed. Decl. of Donovan Fullard in Opp. to Def. Mot. ¶ 1. When a car is delivered to AutoReturn and is not subject to a hold, the owner may reclaim it after paying a fee. *Id.* ¶ 2. AutoReturn sells the car if the owner does not claim it within a certain period of time. *Id.* ¶ 3. AutoReturn sold defendant's car on March 4, 2009, the day after defendant's arraignment in federal court. *Id.*, ex. A (AutoReturn invoice).

On March 3, 2009, shortly after defendant's arraignment in federal court, government counsel contacted San Francisco Police Inspector Michael Hamilton and asked Hamilton to place an "evidentiary hold" on defendant's car. Decl. of Michael Hamilton in Opp. to Def's Mot. to Dismiss ("Hamilton Decl.") ¶ 3. Hamilton then placed an evidentiary hold on defendant's car using the San Francisco Police Department's computer system, which is known as CLETS. *Id.* ¶¶ 3, 4. Hamilton has used CLETS to place evidentiary holds on cars for the last 20 years. *Id.* ¶ 3. A CLETS print-out dated March 3, 2009 shows the notations "HOLD: INSPHAMILTON GW/ATF[1]" and "REMARKS; FEDERAL PROSECUTION." Hamilton Decl., ex. A.

Hamilton did not know that AutoReturn sold defendant's car on March 4. Hamilton Decl. ¶ 5. Government counsel called Hamilton "two or three times" in the weeks after the March 3 hearing to check on the status of the car. *Id.* ¶ 5. Each time counsel called, Hamilton checked CLETS, which

---

[1] "GW" refers to Hamilton's assignment to the General Work detail within the Police Department and "ATF" means that Hamilton is assigned as an Alcohol Tobacco and Firearms task force agent. Hamilton Decl. ¶ 4.

3

indicated that the car was stored at the AutoReturn lot. *Id.* A March 26 print-out from CLETS reflects that, according to the system, defendant's car was still at the AutoReturn lot. *Id.*, ex. B.

On March 27, Hamilton called AutoReturn and discovered for the first time that the towing company had sold the car on March 4. *Id.* ¶ 6. AutoReturn told Hamilton that an individual by the name of Christopher Hicks had bought the car. While Hamilton was out of the office during the week of March 30, inspectors Mike Siebert and Lance Bosshard tried to locate the car. They discovered that Hicks had an alias of Maluum Ifama, and found two addresses on record for Ifama, one in Oakland and one in Lathrop, California, which is approximately 75 miles east of San Francisco. Decl. of William Siebert in Opp. to Def. Mot. ¶¶ 3-6. The Oakland address matched the address Hicks had given to AutoReturn when he bought the car. Siebert and Bosshard went to the Oakland address but found no one home. Siebert left a business card with a note asking the resident to contact him. The officers searched every street in a three-block grid around the Oakland residence but did not find the car. *Id.* ¶¶ 3-5. They did not visit the Lathrop address. *Id.* ¶ 6. No one ever responded to the note Siebert left at the Oakland address. *Id.* ¶ 4.

The following week, Hamilton went to the Oakland address three times. Hamilton Decl. ¶ 8. He was never able to find the car and no one ever answered the door. In mid-April, he checked Department of Motor Vehicle records and discovered that the car had been sold a second time. *Id.* ¶ 9. The new owner was a wanted fugitive with an outstanding warrant for possession of a firearm. Hamilton determined that further attempts to locate the car would be fruitless and dangerous, and abandoned the search. *Id.* He also discovered that he had used the wrong method for placing an evidentiary hold on the car. *Id.* ¶ 10. According to a new police department procedure, he should have placed a hold in person at AutoReturn or through police inspector Dean Marcic. *Id.* ¶ 11.

## DISCUSSION

Defendant argues that the government's failure to preserve his car violated the Due Process Clause and warrants dismissal of the indictment. Due process requires the government to "disclose to criminal defendants favorable evidence that is material either to guilt or to punishment." *See California v. Trombetta*, 467 U.S. 479, 480 (1984) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v.*

4

*Maryland*, 373 U.S. 83 (1963)). If the evidence is only *potentially* exculpatory, the government has a duty to preserve it if it "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. The government's failure to preserve such evidence does not amount to a constitutional violation unless the government acts in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam). In the Ninth Circuit, the destruction of evidence that has the potential at a suppression hearing to impeach allegations in an affidavit for a search warrant violates due process if the defendant can show that the government acted in bad faith. *United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993) ("There is no principled reason why . . . [the *Youngblood*] bad faith requirement should not be applied to a suppression hearing.").

Defendant argues that the government's failure to preserve his car violated the Due Process Clause because an examination of this evidence could have shown that both headlights were working when Officers McKelley and Singh stopped defendant's car. If both headlights were working, defendant would be able to argue that the officers had no reason to stop his car, that the subsequent search of his person was unlawful, and that the drugs must be suppressed. The Court agrees with defendant that he has been denied the opportunity to perform tests on evidence that could have impeached the arresting officers' testimony at a suppression hearing and led to suppression of the drugs that are the basis for his conviction. The government's failure to preserve the car therefore would amount to a due process violation if defendant could show that the police or prosecuting attorney acted in bad faith.

Defendant's motion fails because there is no evidence of bad faith. After defendant's federal defense attorney asked that the car be preserved, the government prosecutor contacted Inspector Hamilton to make sure that the car would not be sold. A CLETS print-out dated March 3, the date of defendant's arraignment in federal court, reflects that Hamilton placed an evidentiary hold immediately using the procedure he was accustomed to following. Hamilton states in his declaration that over the next few weeks, government counsel continued to call him to check on the car. A CLETS print-out from March 26 corroborates Hamilton's testimony that until March 26, he believed that the car was still at the AutoReturn lot. When Hamilton discovered that the car had in fact been sold on March 4, he went

5

to great lengths to retrieve the evidence. He and his colleagues made a total of four trips to Oakland to look for the car. They conducted a three-block grid search for the car and left notes at the buyer's Oakland address asking the resident to contact them. Hamilton abandoned the search only when he discovered that the car had been sold a second time, this time to a fugitive, and that looking for the new owner would likely be futile and dangerous.

It appears that this problem could easily have been avoided if Singh had placed an evidentiary hold on the car when it was first taken to AutoReturn, or if Hamilton had used the correct procedure to place an evidentiary hold when government counsel asked him to do so. It does not appear, however, that either officer acted in bad faith. Singh explained in a declaration that he did not place an evidentiary hold on the car at the outset because he found no contraband in the car and therefore believed it would not be relevant in the drug case against defendant. Singh Decl. ¶ 7. At the evidentiary hearing, Singh testified credibly to the same effect, stating he did not believe it was necessary to place a hold on the car after finding that the car yielded no additional evidence against defendant. Hamilton explains in his declaration that in this case, he used the same procedure – placing a hold through CLETS – that he has used to place evidentiary holds for the past twenty years. Hamilton Decl. ¶¶ 10, 11. The officers' mistakes, while unfortunate, amount to no more than negligence.

Defendant agrees that he must show evidence of bad faith in order for the government's failure to preserve evidence to amount to a due process violation, but contends that to prove bad faith, he need only show that the potential exculpatory value of the car was apparent to the officers before the car was sold. Defendant relies on a statement from a footnote in *Youngblood*, which the Ninth Circuit quoted in *United States v. Cooper*: "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." 983 F.2d 928 (9th Cir. 1993) (citing *Youngblood*, 488 U.S. at 56 n.*). According to defendant, this statement means that the police are presumed to have acted in bad faith if they lose or destroy evidence that they know to be potentially exculpatory. The Court disagrees.[2] The complete quote from *Youngblood* clarifies that

---

[2] The Court also notes that in *Cooper*, the government did not contest the trial court's finding that the government acted in bad faith when they allowed potentially exculpatory evidence to be destroyed while assuring the defendant and his attorney that the evidence was being preserved. *See*

6

if evidence is only *potentially* exculpatory (or, as in this case, is only potential impeachment evidence), the defendant must affirmatively show that the government acted in bad faith:

> *Trombetta* speaks of evidence whose exculpatory value is "apparent." [In this case, t]he possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*. . . . [W]e made clear in *Trombetta* that the exculpatory value of the evidence must be apparent *before* the evidence was destroyed. Here, respondent has not shown that the police knew the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing; this evidence was simply an avenue of investigation that might have led in any number of directions. The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.

488 U.S. 56 at n.* (internal citations omitted).

Here, just as in *Trombetta* and *Youngblood*, the lost evidence provided an avenue of investigation that could have confirmed or undermined the officers' testimony that one headlight on defendant's car was not working. Under *Youngblood*, defendant must do more than show that it was apparent before AutoReturn sold the car that an examination of the car might have produced impeachment evidence.

Accordingly, the Court finds no evidence that the prosecutors or police acted in bad faith and DENIES defendant's motion to dismiss the indictment.

**IT IS SO ORDERED.**

Dated: September 29, 2009

SUSAN ILLSTON
United States District Judge

---

*Cooper*, 983 F.3d at 931.

7